IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 2000 Session

**IN RE: K. A. H.**

**Appeal from the Juvenile Court for Montgomery County**
**No. 73-155     Wayne C. Shelton, Judge**

---

**No. M1999-02079-COA-R3-CV - Filed July 21, 2000**

---

This case involves the termination of parental rights regarding a child who was removed from the mother=s home by the Department of Children=s Services in 1996 and placed in foster care. DCS devised a Plan of Care for the mother, which, among other things, required her to address her drug and alcohol addictions. During the two years between the removal from the home and the filing by DCS of the petition to terminate parental rights, the mother made some efforts to improve her situation, but her substance abuse continued. The trial court terminated the mother=s parental rights on grounds (1) that the conditions that led to the child=s removal continued to persist with little likelihood of remedy and (2) that the mother failed to comply with the Statement of Responsibilities as provided in the Plan of Care. Because DCS has established grounds for termination and has established that termination is in the best interest of the child, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Gail Ann Heller.

Paul G. Summers, Attorney General and Reporter, Douglas Earl Dimond, Assistant Attorney General, Nashville, Tennessee, for the appellee, Department of Children=s Services.

**OPINION**

The child who is the subject of this proceeding was taken into custody in April 1996, after several referrals to the Department of Children=s Services (ADCS@) because of the mother=s[1] apparent

---

[1]The mother declined to name the child=s father. The child=s birth certificate is Asilent as to the name of the father@ and no person filed a notice of intent to claim paternity or acknowledgment of paternity with the Putative Father Registry.

neglect. DCS devised a Plan of Care, which, among other things, required the mother to address her drug and alcohol addictions. During the two years between the removal of the child from the home and the filing by DCS of the petition to terminate parental rights, the mother made some efforts to improve her situation, obtaining employment and a residence. She continued to maintain a relationship with the child. The mother=s substance abuse continued, however. In the interest of making permanent placement of the child possible, DCS initiated this termination proceeding.

## I. Background

The child, K.A.H., a girl, was born in September 1994. She came to the attention of DCS because several people made referrals to DCS alleging that the mother was neglecting her. The first referral was made in February 1996, when someone reported a baby crying inside her home. Police investigated, believing the child to be abandoned, and found the mother present, but Apassed out.@ DCS began working with the mother, developing a APlan of Action@ to prevent the necessity of taking the child into state custody. The Plan of Action included a provision that the mother remain drug and alcohol free. The mother=s difficulties with drugs and alcohol continued, and additional referrals of her neglect were made to DCS.[2] The Department filed a petition to take the child into state custody in April 1996, when the mother, having left the child with a babysitter, was jailed for several days after being arrested while Awalking in the rain while intoxicated and/or high on drugs.@

After the mother=s release from jail, DCS began working with her, attempting to improve her parenting skills so that the child could be returned to her. DCS developed a APlan of Care,@ outlining the steps the mother needed to take before she could regain custody of her daughter. The steps included visiting the child regularly, having a drug and alcohol assessment, undergoing random drug and alcohol tests, and attending substance abuse treatment programs, counseling sessions, and parenting classes.

---

[2]Other referrals were made because the mother picked the child up from daycare while intoxicated, failed to give the child her medicine when she was sick, and left the child alone in a car while she went to a bar and became intoxicated.

The mother maintained a job in food service throughout most of the time the child was in foster care, except when she was in jail or hiding from authorities.[3] Her visits with the child were consistent, with the same two exceptions. No one disputed that the mother loved her daughter and that the two had Abonded.@ Early in the process, the mother was allowed unsupervised visitation, but her continued drug use made such visits impossible, so all later visits were supervised. The mother consistently took toys and clothes to the child at the visits, even though the foster care worker suggested that she could better spend the money improving her situation so the child could return to her. The mother=s interaction with the child was described as Aappropriate.@

DCS personnel worked with the mother consistently throughout the two and one half years the child was in custody. The foster care workers encouraged the mother to attend counseling sessions, parenting classes, and alcohol and narcotics users= support groups, even providing transportation and financial assistance when needed and appropriate. They described the mother=s tearful promises to do better in her efforts to stop abusing drugs, but the mother never followed through on her promises. She never had a drug and alcohol assessment, and did not inquire about obtaining one until immediately prior to the hearing. She went to a few Alcoholics Anonymous and Narcotics Anonymous meetings, but refused to attend any more. She consistently failed the drug tests, testing positive for cocaine and marijuana, until shortly before the hearing. Even three weeks prior to the hearing, the mother tested positive for Valium.[4] She admitted to having taken the drug, but claimed that she did not realize that Valium would show up on the drug test.

The mother attended four sessions of a parenting class, but did not complete the program. She began counseling sessions with a psychologist, but stopped going to her sessions. The psychologist had referred her to a psychiatrist for her depression. The psychiatrist prescribed antidepressant drugs for the mother, but DCS refused to pay for additional prescriptions after the mother took all of the pills remaining in the bottle at one time.

DCS filed the petition to terminate the mother=s parental rights in March 1998 based on the persistence of the conditions which led to the removal of the child from the home, and the mother=s failure to comply with the Plan of Care.[5] After learning of the petition, the mother claimed she was Aserious this time@ about following the plan. She resumed the Alcoholics Anonymous meetings in

---

[3]The mother was incarcerated for more than one instance of driving on a suspended license. She provided the police a false name, the name of a friend, once when she was stopped. She hid from authorities after the friend reported her.

[4]The mother did not have a prescription for Valium. She obtained the drug from a friend.

[5]In its Prayer for Relief, DCS also asked the court to find that the mother had abandoned the child. The mother had not visited the child between December 1997 and April 1998 because she was hiding from authorities and then incarcerated. DCS did not argue at trial that the mother had abandoned the child.

May 1998. She managed a few negative drug tests, but also tested positive for cocaine and Valium in the months after the petition was filed. The hearing for the termination of parental rights was held August 31, 1998. Following the presentation of the evidence, and noting the trial court=s concern about the continued drug use, the mother asked the court for Amore time.@

After hearing the evidence, the trial court terminated the mother=s parental rights, stating from the bench:

> You=ve had two-and-a-half years. It=s not a matter of fun and games with the child an hour a week. It=s a matter of not being on crack cocaine, not being on marijuana, not being high on alcohol, but being there at night when that child is sick; taking that child=s temperature when she has a fever; fixing supper for that child; fixing breakfast for that child. It=s those things of being a parent. It=s not just the fun and games. It=s the work. It=s the dedication. It=s the sacrifice. And that=s what you=re not willing to make. Your sacrifice is dedicated totally to your use of chemicals, your getting high, your party, your fun is much more important than that child. . . . Permanency for that child is what the Court has to look to. What=s the best permanent arrangement for that child to grow up and be a productive member of society. Depending on a mother for another six months, another two-and-a-half years and then five years of care have gone by hoping that some day she gets off the chemicals . . . If after two-and-a-half years you can=t change, it=s called constructive abandonment.

The trial court=s order terminating the mother=s parental rights stated:

> [the mother] has abandoned the child, [K.A.H.], pursuant to T.C.A. ' 36-1-113(g)(3)(A) et seq., in that said child has been removed from the custody of [the mother] for more than six (6) months, and that the conditions which led to the removal of said child from said Defendant, and would in all reasonable probability cause said child to be further abused or neglected, still persist; that there is little likelihood that these conditions will be remedied in the near future; and, that said child is of such an age that the continuation of the legal parent and child relationship greatly diminishes said child=s chances of early integration into a stable and permanent home; and further, that pursuant to T.C.A. ' 36-1-113(g)(2), [the mother] has failed to comply with the Statement of Responsibilities as provided in the Plan of Care . . .

The mother appeals the trial court=s termination of parental rights.

## II. Standard of Review

Because the decision to terminate parental rights affects fundamental constitutional rights, courts apply a higher standard of proof when adjudicating termination cases. *See O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995). To justify the termination of parental rights,

the grounds for termination must be established by clear and convincing evidence. *See* Tenn. Code. Ann. ' 36-1-113(c)(1) (Supp. 1999); *State Dep=t of Human Servs. v. Defriece*, 937 S.W.2d 954, 960 (Tenn. Ct. App. 1996). Evidence which satisfies the clear and convincing standard "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." *O'Daniel*, 905 S.W.2d at 188.   "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

> The Aclear and convincing evidence@ standard defies precise definition.  While it is more exacting than the preponderance of the evidence standard, it does not require such certainty as the beyond a reasonable doubt standard.  Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence.  It should produce in the fact-finder=s mind a firm belief or conviction with regard to the truth of the allegations sought to be established.

*O=Daniel*, 905 S.W.2d at 186.

Under this heightened standard of review, we must first review the trial court=s findings in accordance with Tenn. R. App. 13(d).  That review  is *de novo*, with a presumption of correctness for the trial court=s findings of fact, unless the preponderance of the evidence is otherwise.  *See* Tenn. R. App. P. 13(d).  Then, we must determine whether the facts make out a clear and convincing case in favor of terminating the parents=parental rights.  *See In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988).

Parental rights may be terminated in only a limited number of statutorily defined circumstances.  Before termination, one or more of the asserted statutory grounds[6] must be proved by clear and convincing evidence and the court must determine, also using the clear and convincing evidence standard, that termination is in the child=s best interest.  *See* Tenn. Code Ann. ' 36-1-113(c)(2) (Supp. 1999).

### III.    The Conditions Which Led to Removal Persist

The trial court based the termination of parental rights on Tenn. Code Ann. ' 36-1-113(g)(3)(A), which provides the following as grounds for seeking termination:

---

[6]Although the trial court used the term Aabandonment@ in its statement from the bench and in its final decree, we do not interpret abandonment as one of the grounds for termination of the mother=s rights relied upon by the court.  The grounds for termination were the persistence of conditions which led to the removal of the child or other conditions potentially subjecting the child to neglect and the mother=s failure to comply with the Plan of Care.

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

We find that the elements of Tenn. Code Ann. ' 36-1-113(g)(3)(A) have been met. The child had been removed from the home by order of a court for six months. She had been in foster care for two and one half years at the time of the hearing. The condition which led to the child=s removal was the neglect caused primarily by the mother=s drug and alcohol use. That drug and alcohol use persists. The mother tested positive on her drug screens throughout the period when the child was in foster care, including a positive test just before the hearing. Similarly, there is little likelihood that the condition will be remedied at an early date so that the child can be safely returned to the mother. This mother has had more than two years, and assistance, to deal with her drug problem. She was told, even before the child was removed from her care, that her drug use created a problem for the child. She did not take steps to remedy the situation, and the child was taken into state custody. Even after the child was in foster care, the mother resisted DCS efforts to help her overcome her dependency. She was offered transportation to Alcoholics Anonymous and Narcotics Anonymous meetings, but after a few meetings, refused to attend any more. She never had a drug and alcohol assessment, as required by her Plan of Care. Three weeks prior to the hearing, knowing that her drug abuse was an important issue in the termination proceedings, the mother ingested drugs. Her protestations that she did not know that that particular drug would show up on a drug test simply affirm the foster care worker=s assessment that the mother Amanipulat[es] the system.@ She claims to want her child back, but she is simply unwilling or unable to put the child=s needs above her own chemical dependency.

The final element, A[t]he continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home@ has also been met. *See* Tenn. Code Ann. ' 36-1-113(g)(3)(A)(iii). This child was four years old at the time of the hearing, and had been in foster care for more than half of her life. She needs a permanent home where she can Agrow up and be a productive member of society.@ The mother cannot provide a permanent stable home for the child and is unlikely to be able to do so in the near future. Absent termination of the mother=s rights, the child cannot hope for a permanent, stable home.

The mother does not argue that the elements have not been met. She argues that DCS has not proved Avia clear and convincing evidence, that this parent/child relationship could not be salvaged,

nor that the relationship between [K.A.H.] and her mother is currently harmful to [K.A.H.=s] safety . . . or future emotional stability.@

The mother misunderstands the requirements for termination of parental rights. DCS is not required to prove that a parent-child relationship cannot be salvaged. Nor is DCS required to show that a parent is Acurrently harmful@ to a child=s safety or future emotional stability. The question herein is the likelihood that the child can be safely returned to the custody of the mother, not whether the child can safely remain in foster care with weekly visits with the mother. Our termination of parental rights statutes recognize a child=s need for a permanent, stable environment which this mother has demonstrated she is unwilling or unable to provide. DCS has proved, through clear and convincing evidence, that, pursuant to Tenn. Code Ann. ' 36-1-113(g)(3)(A), the child has been removed from the home of the parent by order of a court for a period of six months, and the conditions which led to the child=s removal from the home continue to persist and prevent the child=s return to the home, that there is little likelihood that the conditions will be remedied in the near future, and that continuation of the parent-child relationship greatly diminishes the child=s chances of being placed in a permanent home. Thus, statutory grounds[7] for termination have been proved and we turn to whether termination of parental rights is in the best interest of the child.

IV. Termination of Parental Rights is in the Child=s Best Interest

Once statutory grounds for termination have been established, the court must determine, based on clear and convincing evidence, that termination of parental rights is in the best interest of the child. See Tenn. Code Ann. ' 36-1-113(c)(2) (Supp. 1999). The mother argues that a strong bond exists between the child and herself, and that she should be given Aa true chance to regain custody of her child.@ Tenn. Code Ann. ' 36-1-113(i) states:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

---

[7]The trial court found the mother=s failure to comply with the Plan of Care, pursuant to Tenn. Code Ann. ' 36-1-113(g)(2), to constitute an additional ground for termination of the mother=s parental rights. It is not necessary for us to address that finding because we have affirmed the trial court=s determination that the ground set out in Tenn. Code Ann. ' 36-1-113(g)(3)(A) has been proved clearly and convincingly. The mother=s drug and alcohol abuse, the condition which led to the removal of the child, was also the primary factor in her failure to comply with her Plan of Care.

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward other children in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to ' 36-5-101.

Our own review of the evidence, in light of those factors, compels our agreement with the trial court that the termination of the mother=s rights is in the best interest of this child. The mother has not made an adjustment of conditions, specifically her use of drugs and alcohol, which would make it safe and in the child=s best interest to be in her home. *See* Tenn. Code Ann. ' 36-1-113(i)(1). She has failed to make the adjustment, despite reasonable efforts by DCS, and such adjustment does not reasonably appear possible. *See* Tenn. Code Ann. ' 36-1-113(i)(2). Certainly, there is Asuch use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner.@ Tenn. Code Ann. ' 36-1-113(i)(7). Considering the above factors, and the child=s need for permanency, we agree with the trial court that termination of the mother=s parental rights is in the best interest of the child.

In a similar case, a mother who could not overcome her addiction argued that, while the statutory grounds existed, termination of her parental rights was not in the children=s best interest. *See State Dep=t. of Children=s Servs. v. Hunter*, No. 1999-02606-COA-R3-CV, 2000 WL 313549 at *1 (Tenn. Ct. App. Mar. 29, 2000) (no Tenn. R. App. P. 11 application filed). That mother, like the one in the case before us, visited her children frequently, testified that she and her children had bonded as a family, and claimed to be making progress in the treatment of her drug abuse. *See id.* at *3. That mother also used illegal drugs shortly before the hearing on the petition to terminate her parental rights. This court affirmed the trial court=s termination of parental rights, stating:

[T]he judge felt compelled to recognize . . . that despite having a considerable amount of support from DCS for almost nineteen months, [the mother] had made very little progress towards the goals she had to reach before being reunited with her children; that the children were getting older and that they needed stability in their

lives; that being an effective parent involves far more than visiting . . . [W]e believe [the mother=s] failure to make fundamental adjustments in her life makes the termination of her parental rights an inescapable conclusion. . . . Continuation of the parental relationship would eliminate any realistic possibility of the children being integrated into a stable and permanent home. It is in their best interest that her parental rights be terminated.

*Id*. at *3-4.

Fully aware of the gravity of the decision to terminate a parent=s rights, we think the reasoning in *Hunter* applies here with equal force. This mother states that she would like to regain custody of her daughter, but she has shown that she is simply unable to overcome her dependency on drugs and alcohol. Two and one half years have passed, as stated by the trial court, Ahoping that some day she gets off the chemicals.@ The child needs stability in her life, and the mother has proved herself unable to provide that stability. To do other than affirm the termination of parental rights would leave the child in foster care indefinitely.

## V. Court Appointed Psychologist

The mother also argues that the trial court erred in denying her motion for a court appointed psychologist. The motion before the trial court asked for a Apsychologist to evaluate the relationship now existing between [the mother and] the minor child,@ and estimated the cost at $500 to $600. DCS argued against the motion, stating, AThe case doesn=t have anything to do with the parent/child relationship. . . . This is a case about the parent and her neglect of the child. And her own functioning or lack of functioning, it=s based on her alcohol, drug, substance abuse problems. . . .@ The trial court denied the mother=s motion.

We must agree with DCS. The motion asked for a psychologist to evaluate the relationship between the mother and child. The relationship between the mother and the child was not the issue in this case. DCS foster care workers admitted that the visits between the mother and child went well, and that a bond existed between them. It is quite possible that a psychologist would have reached a similar conclusion, but the outcome would have been the same. The issue in the case before us was the mother=s inability to overcome the obstacles in her life which caused her to neglect the child. We find no merit in the mother=s argument that the court erred in denying her motion to appoint a psychologist to evaluate her relationship with her daughter.

## VI. Conclusion

We affirm the order terminating the mother=s parental rights and remand the case to the trial court for such further proceedings as may be required. Costs of this appeal are taxed to the mother, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE